UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

REINALDO CLAUDIO,

                    Petitioner,                    Case No. 1:09-cv-94

v.                                      Honorable Paul L. Maloney

MARY BERGHUIS,

                    Respondent.

_____/

**OPINION**

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was convicted in the Kent County Circuit Court of assault with intent to do great bodily harm less than murder, MICH. COMP. LAWS § 750.84, and first-degree home invasion, MICH. COMP. LAWS § 750.110a. On June 1, 2006, the trial court sentenced him as a subsequent felony offender, MICH. COMP. LAWS § 769.10, to imprisonment of five to fifteen years for the assault conviction and nine to thirty years for the home invasion conviction. In his *pro se* third amended petition,[1] Petitioner raises six grounds for relief, as follows:

_____

[1] On February 5, 2009, Petitioner filed his original petition raising eight claims for relief with numerous sub-claims. Petitioner amended his petition several times and filed multiple supplements to the amended petitions. Because the numerous amendments and supplements made it impossible for the Court to ascertain the claims upon which Petitioner sought relief, on November 4, 2010, the Court ordered Petitioner to file a third amended petition on the form petition. The Court directed Petitioner to include each of his grounds for relief and a brief statement of facts supporting each ground. The Court's order prohibited Petitioner from incorporating by reference any information from other pleadings or documents, and warned Petitioner that the third amended petition would take the place of all previously filed petitions. Consequently, the Court considers only those grounds for relief raised in Petitioner's third amended petition. (docket #24.)

1.  The prosecutor failed to present sufficient evidence to support the conviction for assault with intent to commit great bodily harm;

2.  The prosecutor failed to present sufficient evidence to support the conviction for first-degree home invasion;

3.  The trial court violated Petitioner's due process rights by allowing the prosecutor to amend the information to change the charge of third-degree home invasion to first-degree home invasion without notice or arraignment hearing on the new charge;

4.  Defense counsel was ineffective for failing to challenge the admission of the knife that allegedly was used to stab the victim;

5.  The trial court violated Petitioner's constitutional rights when it answered a question from the jury outside of Petitioner's presence; and

6.  Appellate counsel was ineffective for failing to raise the above claims on direct appeal.

Respondent has filed an answer to the petition (docket #30) stating that the grounds should be denied because they have no merit.  Upon review and applying the AEDPA standards, the Court finds that the petition is without merit.  Accordingly, the petition will be denied.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose after Petitioner and Donnell Williams beat and stabbed their neighbor Kyle Jaworowicz on January 18, 2006.  Petitioner waived a preliminary examination and proceeded to trial.  By the time of his trial, Petitioner was charged with assault with intent to do great bodily harm less than murder, first-degree home invasion, felonious assault, and armed robbery.  A supplemental

information was filed charging Petitioner as a second-offense habitual offender. Petitioner was tried before a jury beginning May 30, 2006, and concluding on June 1, 2006.[2]

       Lori Fuentes, who was Jaworowicz's girlfriend at the time of the incident, testified that she lived in Apartment 1 at 320 Henry. (Tr II, 53.) She worked at Spectrum Hospital. (*Id.* at 54.) She got a call from Williams while she was at work. (*Id.*) Williams told her that Jaworowicz had stolen his drugs and Williams and Petitioner were going to "jump him." (*Id.* at 55.) Fuentes told Williams to talk to Jaworowicz because he had never stolen anything from Williams before. (*Id.*) Fuentes knew Petitioner because he began living across the hall from her a few weeks prior to the incident. (*Id.*) A few hours after she had spoken to Williams, Fuentes got a page at the hospital telling her that Jaworowicz was in the trauma unit. (*Id.* at 54-55.) She stayed overnight at the hospital with Jaworowicz, although she did go back to her apartment to get some things. (*Id.* at 56-57.) Her apartment had been trashed. (*Id.* at 56-57.) Her table, chairs, and end tables were broken and unusable. (*Id.*) Fuentes and Petitioner were acquaintances prior to the incident. (*Id.* at 58.) Petitioner did not have permission to walk into her apartment unannounced and uninvited. (*Id.*) Moreover, Fuentes testified that her relationship with Williams and Petitioner was not the kind of relationship where Petitioner or Williams could just walk into her apartment. (*Id.*) She did not give Williams or Petitioner permission to enter her apartment on the night of the incident. (*Id.* at 59.)

---

[2]The trial transcripts will be referred to as follows:
  "Tr. I" - Trial Transcript Volume I, May 30, 2006 (docket #34)
  "Tr. II" - Trial Transcript Volume II, May 31, 2006 (docket #35)
  "Tr. III" - Trial Transcript Volume III, June 1, 2006 (docket #36).

A few days after the incident Fuentes went back home to grab some clothes. (*Id.* at 59-60.) She had not been staying at her apartment since the incident because threats had been made. (*Id.* at 59.) While at the apartment, she found the knife that was used to stab Jaworowicz. (*Id.* at 59-60.) The knife was broken and was laying on the floor in her kitchen near the garbage. (*Id.*) Jaworowicz picked the knife up off the floor and put it on the counter and then, sometime later, a detective took it. (*Id.* at 60.)

Jaworowicz testified that he lived at 320 Henry with Fuentes at the time of the incident. (*Id.* at 78-79.) Jaworowicz knew his neighbors, Williams and Petitioner. (*Id.*) He was friendlier with Williams than Petitioner. (*Id.* at 80.) On the day of the incident, Jaworowicz was with Williams and Petitioner in their apartment watching movies and playing video games. (*Id.* at 81.) He was in their apartment most of the day, then left to go to a bar where he played pool with a friend. (*Id.*) Neither Williams nor Petitioner came with Jaworowicz to the bar. (*Id.* at 82.) After he left the bar, Jaworowicz went home and was sitting at the kitchen table with a beer relaxing when he heard the front door open. (*Id.* at 82.) After he heard the front door open he heard someone say his name, then he turned and saw Petitioner holding a beer bottle upside down, like he was getting ready to hit somebody with it. (*Id.* at 83.) Jaworowicz never heard a knock at the door, nor did he hear anyone ask if they could come in. (*Id.* at 86.) Jaworowicz did not open the door for Williams and Petitioner, nor was he expecting them to come over, nor did he invite them in. (*Id.* at 85.) Williams and Petitioner were already in the apartment when they called out Jaworowicz's name. (*Id.*) Williams came around to Jaworowicz's left and Petitioner was right in front of him. (*Id.* at 84, 86.) Petitioner asked Jaworowicz "Where is the shit at?" and Jaworowicz said, "What do you mean?" (*Id.* at 84.)

At that point, Petitioner lifted the bottle to hit Jaworowicz with it.  (*Id.* at 84.)  Jaworowicz grabbed Petitioner's arm to keep from getting hit with the bottle.  (*Id.*)  Williams then punched Jaworowicz on the left side of his face and, at that point, both Williams and Petitioner began hitting Jaworowicz in the face and head.  (*Id.* at 84, 86-87.)  Williams eventually choked Jaworowicz from behind.  (*Id.* at 84, 86-87.)  While Williams was choking Jaworowicz, Petitioner was punching Jaworowicz in the ribs.  (*Id.* at 88.)  When Williams came from behind and choked him, Jaworowicz "must have went [sic] unconscious for a second and lost my ground and fell down, and the way I fell, I moved the table out of the way and landed underneath the table."  (*Id.* at 89.)  Jaworowicz woke up on his back underneath the dining room table.  (*Id.* at 84.)  Jaworowicz could not recall the sequence of events, but he knew that Petitioner hit him with a chair, which broke, and then hit him with the broken chair.  (*Id.* at 84, 89.)  Petitioner and Williams kicked Jaworowicz in the head a couple of times, punched him and stomped on him a few times.  (*Id.*)  Jaworowicz tried to get up but was kicked in the ribs and went down on his back.  (*Id.* at 89.)  Jaworowicz does not recall if his knife fell out of his pocket, or if Petitioner grabbed it out of the pocket, but Petitioner asked Jaworowicz if he liked playing with knives, and then stabbed Jaworowicz in the stomach.  (*Id.* at 84, 90.)  After Petitioner stabbed Jaworowicz, Petitioner took all of the money that Jaworowicz had in his wallet.  (*Id.* at 95.)  Petitioner and Williams told Jaworowicz to leave the apartment. (*Id.* at 95-96.)  Jaworowicz got up, left the apartment and walked up to the Cherry Street Market.  (*Id.*)

Before the incident, Jaworowicz had been drinking some beers, but he was not sure if he had also used drugs that night or earlier in the week.  (*Id.* at 96.)  At some point that day, Jaworowicz had used cocaine and smoked marijuana. (*Id.* at 96, 113.)  Jaworowicz had been playing video games with

Petitioner and Williams before the incident.  (*Id.* at 97.)  The men had not argued or had any disagreements before the incident.  (*Id.*)  Jaworowicz denied taking anything from Williams or Petitioner that day.  (*Id.*)

Two days after the incident, and after Jaworowicz was released from the hospital, Jaworowicz and Fuentes returned to the apartment to clean up and found the knife, which was broken, in the back of the kitchen area by the trash.  (*Id.* at 93.)  Jaworowicz picked up the broken knife and placed it on the counter by the microwave.  (*Id.*)

Jeffrey Dionne, a street patrol officer with the Grand Rapids Police Department (GRPD) was dispatched to the Cherry Street Market at around 9:00 p.m. regarding a stabbing that had just occurred.  (*Id.* at 29-30.)  He spoke with Jaworowicz, who was being treated by medical staff inside an ambulance that was parked in front of the Market.  (*Id.* at 30.)  Jaworowicz was a little agitated, but coherent and cooperative.  (*Id.*)  Jaworowicz gave a brief statement that was generally consistent with his testimony at trial.  (*Id.* at 31-39.)  Dionne and an assisting officer went to the apartment at 320 Henry and arrested Petitioner.  (*Id.* at 33.)

Dionne later went to the hospital and spoke to Jaworowicz and Fuentes, and took pictures of Jaworowicz's injuries.  (*Id.* at 34-35.)  Jaworowicz did not appear to be under the influence of drugs or alcohol.  (*Id.* at 39.)

Paul Anderson, a first-year resident in surgery at Spectrum Health testified that in the early morning hours of January 19, 2006 he was working trauma service when Jaworowicz arrived at the hospital.  (*Id.* at 119.)  Dr. Anderson had no independent memory of Jaworowicz or the incident.  (*Id.* at 132.)  As a result, Jaworowicz's admission record, which was largely written by Dr. Anderson, was admitted into evidence and Dr. Anderson was questioned about what he had written. (*Id.* at 121.)  Dr.

Anderson noted that Jaworowicz suffered a "posterior contusion," had bloody lips but no broken teeth or bones. (*Id.* at 122, 132-33.) Dr. Anderson also noted that Jaworowicz had a stab wound to the stomach. (*Id.* at 122, 124.) Dr. Anderson did not note how deep the puncture wound was and did not think that the depth of the wound was ever measured. (*Id.* at 133) Jaworowicz was able to communicate. (*Id.* at 123.) Dr. Anderson noted that Jaworowicz had denied losing consciousness, and had admitted to drinking alcohol and using .5 grams of cocaine. (*Id.* at 126-127.)

On cross-examination, Dr. Anderson was questioned regarding whether Jaworowicz's injuries were life-threatening. (*Id.*) Dr. Anderson responded "I don't know if I can answer that. [Jaworowicz] was admitted for observation. He was considered to be stable in the trauma bay, but considered worthy of an extra night in the hospital to be sure that there was no developing injury that [was] not picked up on our initial survey." (*Id.* at 133-134.) Further, in response to Petitioner's counsel's question about whether Jaworowicz suffered any permanent injury to any part of his body, Dr. Anderson stated: "I don't believe so, but -- I don't really know if that's a correct, you know, how to answer the question, but it didn't seem like he had any ongoing or permanent injury, but it would be difficult for me to say with my short interaction with the patient . . . ." (*Id.* at 134.)

Detective Smith, a 16-year veteran of the GRPD detective unit was working with the major case team at the time of the incident. (*Id.* at 140.) The major case team handles serious assaults, felonious assaults and homicides. (*Id.*) Smith was assigned the case on January 19, 2006. (*Id.* at 141.) Initially the knife was not found. (*Id.*) At the February 2, 2006, preliminary hearing Jaworowicz testified that he had found the knife. (*Id.* at 141.) After the preliminary hearing, Smith went with Jaworowicz and Fuentes to the apartment and took possession of the knife. (*Id.*)

Smith met with Petitioner and Williams on January 19, 2006, within about 12 hours of the incident and although Petitioner stated he received a cut on his hand, Smith did not see any evidence that either Petitioner or Williams had been injured. (*Id.* at 142.)

Smith spoke with Fuentes on January 23, 2006 and learned that she had spoken to Petitioner and Williams on the night of the incident. (*Id.* at 144.) Fuentes told Smith that Petitioner and Williams had accused Jaworowicz of "some foul play in their apartment." (*Id.*) Fuentes told Smith that she had advised Petitioner and Williams to "take it up with Kyle." (*Id.*)

Cecile Herald, the forensic services manager for the GRPD, testified regarding a report she prepared after Detective Smith gave her Jaworowicz's broken folding knife to examine. (*Id.* at 136-137.) Herald's main function at GRPD is to supervise crime scene technicians and latent print examiners. (*Id.* at 136.) Detective Smith gave Herald part of the knife handle and the blade and she examined the items for latent prints and then swabbed the handle for trace DNA. (*Id.* at 137-138.) Herald found no useable prints. (*Id.* at 138.) Herald did not receive the knife until February 7, 2006. (*Id.* at 138.)

The People rested on May 31, 2006. (*Id.* at 145.) Defendant did not testify or present any witnesses. (*Id.* at 145.) Defendant moved to dismiss the charges of assault with intent to commit great bodily harm and first-degree home invasion. (*Id.* at 149.) The Court denied the motion with respect to both charges. (*Id.* at 150.)

On June 1, 2006, the jury was instructed, heard closing arguments, then began deliberations at or about 10:48 a.m. (Tr. III, 3-63.) At approximately 12:35 p.m. the judge received a question from the jurors which he read into the record. The question stated:

- 8 -

> To the judge, Page 18, Paragraph 5, 'Fourth that the defendant or someone he aided or
> abetted committed the assault with a knife.' Can the word 'knife' be replaced with a
> dangerous weapon."

(*Id.* at 63-64.)

The judge noted that he met with counsel in chambers, discussed the note with them both,

and responded to the jury in writing as follows:

> Yes, it can, and my initial instruction should have said,' . . . with a knife or other dangerous
> weapon.' I apologize for that oversight in my initial instructions.

(*Id.*)

The judge signed and initialed the response and returned it to the jury at 12:46 p.m. (*Id.*)

Petitioner's counsel stated that she believed the Judge's response reflected the correct statement of the law.

(*Id.* at 64.) The Court also noted that the parties consented to the Judge responding to the jury in writing,

which was confirmed by all counsel. (*Id.*) The judge also stated that:

> on occasion when I get questions from juries, sometimes we bring the jury back in and go
> through a rather lengthy explanation. Other times when it's a relatively straightforward
> question, like this one was, I'll submit it in writing, the response. I haven't had objections
> to either, but it depends on the circumstances, and I determined in my responsibilities on
> the management of the case that that was the most efficient way to respond to it.

(*Id.*)

The jury unanimously found Petitioner guilty of Count 1 (assault with intent to great bodily

harm less than murder) and Count 3 (first-degree home invasions), but the jury did not consider Count 2

(felonious assault) because it found Petitioner guilty of Count 1 and found Petitioner not guilty of Count 4

(armed robbery). (*Id.* at 66.) Petitioner's counsel objected to the second habitual offender finding based

on Petitioner's prior conviction in the state of Illinois because she had not seen a copy of the Illinois

judgment. (*Id.* at 66-67.) Petitioner's bond was revoked and he was remanded to the custody of the Kent County Sheriff pending sentencing. (*Id.* at 67.)

Petitioner was sentenced on August 15, 2006. (Sentencing Transcript, (S.Tr.), docket #37.) After hearing Petitioner's counsel's objections to the Presentence Investigation Report, the Court reduced Petitioner's OV Score to level IV, instead of V. (*Id.* at 7-12.) Thereafter, Petitioner was sentenced to concurrent prison terms of 9 to 30 years on the first-degree home invasion conviction and 5 to 15 years on the conviction for assault with intent to do great bodily harm less than murder. (*Id.* at 15.)

### B.     Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on March 20, 2007, raised the following two grounds for relief:

> I.      WHERE THE EVIDENCE OF ASSAULT WITH INTENT TO COMMIT GREAT BODILY HARM LESS THAN MURDER (AGBH) WAS INSUFFICIENT, DEFENDANT HAS THEREBY BEEN DENIED DUE PROCESS OF LAW AND IS ENTITLED TO A NEW TRIAL, IN PARTICULAR WHERE AGBH WAS A NEXT-LESSER OFFENSE TO AN IMPROPERLY SUBMITTED GREATER OFFENSE, US CONST AM XIV; MICH CONST AST 1, § 17.

> II.     WHERE THE EVIDENCE OF HOME INVASION WAS INSUFFICIENT DEFENDANT HAS BEEN DENIED DUE PROCESS OF LAW AND IS ENTITLED TO A NEW TRIAL, IN PARTICULAR WHERE THE HOME INVASION CHARGE WAS A NEXT-LESSER OFFENSE TO AN IMPROPERLY SUBMITTED GREATER OFFENSE, US CONST AM XIV; MICH CONST ART 1, § 17.

(*See* Def.-Appellant's Br. on Appeal, docket #38.)

On June 11, 2007, Petitioner filed a *pro per* Standard 4 Brief raising five additional grounds for relief:

      I.       Prosecutorial Misconduct

      II.     Double Jeopardy

      III.    Sentence Scoring Error

      IV.    Jurisdictional Defects

      V.     Ineffective Assistance of Counsel

(*See* Def.-Appellant's Supplemental Br. on Appeal, docket #38.)

By unpublished *per curiam* opinion issued on December 18, 2007, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 12/18/07 Mich. Ct. App. Opinion (MCOA Op.), docket #38.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court, in which he raised three grounds for relief:

I.  The evidence of assault with intent to do great bodily harm less than murder was insufficient.

II.  The evidence of home invasion was insufficient.

III.  Defendant's Due Process rights to a fair trial and notice were violated for the charges of Counts 4 & 5 where he was never arraigned nor formally charged MCR 6.104 et seq.

(*See* Def.-Appellant's Pro Per Appl. for Leave to Appeal, docket #39.)

By order entered April 28, 2008, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* 4/28/08 Mich. Sup. Ct. Order (MSC Ord.), docket #39.)

      **C.**     **Post-conviction relief**

On June 3, 2009, Petitioner filed a motion for relief from judgment in the Kent County Circuit Court. The circuit court denied his motion on June 29, 2009. (*See* 6/29/09 Kent Count Circuit Court Order (Circuit Court Ord.), docket #40.) The Michigan Court of Appeals and the Michigan Supreme Court denied his applications for leave to appeal on February 10, 2010 and September 9, 2010, respectively.

Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower

federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014); *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). The court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Id.* A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784 (2011)).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.  *See Harrington*, 131 S. Ct. at 784; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference).  The presumption, however, is not irrebuttable.  *Johnson*, 133 S. Ct. at 1096.  Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review.  *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 131 S. Ct. at 785 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407

n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

1.   Ground One—Insufficient evidence: Assault with Intent to Commit Great Bodily Harm

Petitioner argues that the prosecutor failed to present sufficient evidence to support the jury's guilty verdict on the charge of assault with intent to do great bodily harm less than murder. Specifically, Petitioner argues that there was insufficient evidence to demonstrate intent. In support of this argument, Petitioner claims that Dr. Anderson testified that the victim's wound was a puncture and not a slash wound, thus, it was no more than a skin wound and there were no life threatening injuries to the victim. Further, neither Petitioner's nor the victim's DNA was found on the knife recovered from the victim's apartment.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable

to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* Moreover, because both the *Jackson* standard and the AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)).

The elements of assault with intent to do great bodily harm less than murder are: (1) the defendant tried to physically injure another person, (2) at the time of the assault, the defendant had the ability to cause an injury or believed that he had the ability, (3) the defendant intended to cause great bodily harm. M Crim JI 17.7; *see* MICH. COMP. LAWS § 750.84. "Actual injury is not necessary, but if there was an injury, [the jury] may consider it as evidence in deciding whether the defendant intended to cause great bodily harm." M Crim JI 17.7. Great bodily harm means any physical injury that could seriously harm the health or function of the body. *Id.*

The Michigan Court of Appeals considered petitioner's argument on direct appeal and rejected it as follows:

> We review challenges to the sufficiency of the evidence de novo and, in doing so, "view the evidence in a light most favorable to the prosecution to determine whether the [trier of fact] could have found that the essential elements of the crime were proved beyond

a reasonable doubt." See *People v Sherman-Huffman*, 241 Mich App 264, 265; 615 NW2d 776 (2000). Circumstantial evidence and the reasonable inferences that arise therefrom can constitute sufficient proof of the elements of a crime. *People v Lugo*, 214 Mich 699, 710; 542 NW2d 921 (1995). A conviction of assault with intent to do great bodily harm less than murder requires proof of: "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Parcha*, 227 Mich App 236, 239; 575 NW2d 316 (1997). A defendant's intent may be inferred from all the facts and circumstances surrounding the crime. See *Lugo, supra* at 709-710. The intent to do great bodily harm less than murder "has been defined as an intent to do serious injury of an aggravated nature." *People v Mitchell*, 149 Mich App 36, 39; 385 NW2d 717 (1986).

       Defendant argues that the prosecutor failed to produce evidence showing that defendant intended to inflict great bodily harm on the victim, because the injuries were not serious. Although defendant testified that he did not possess a knife, the victim testified that defendant took his knife and stabbed him in the stomach with it. The physicians who treated the victim observed a "puncture wound" in his stomach. This Court has previously determined that the intent to do physical harm can be inferred from the fact that a defendant used a dangerous weapon. *People v Crane*, 27 Mich App 201, 204; 183 NW2d 307 (1970). Furthermore, the victim's girlfriend testified that, shortly before the assault occurred, codefendant Donnell Williams informed her during a telephone conversation that "it was curtains for" the victim, because Williams and his roommate, defendant, "were going to jump him" because of some stolen drugs. A reviewing court must make credibility choices in support of the jury's verdict. *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000). Given the difficulty of proving state of mind, minimal circumstantial evidence is sufficient to prove that an actor had the requisite intent. *People v Strong*, 143 Mich App 442, 452; 372 NW2d 335 (1985). The evidence presented at trial supported the jury's verdict that defendant had the requisite intent to do great bodily harm less than murder.

(MCOA Op., 1-2, docket #38.)

       Examining the evidence supporting the conviction in the light most favorable to the prosecution, as the Court must do, *see Jackson*, 443 U.S. at 319, there was sufficient evidence to support Petitioner's conviction for assault with intent to do great bodily harm less than murder. Lori Fuentes, Jaworowicz's girlfriend with whom he lived at the time of the incident, testified that she received a call from

Williams while she was at work.  (Tr II, 54.)  Williams told Fuentes that Jaworowicz had stolen drugs from

his apartment and that Williams and Petitioner were going to "jump him."  (*Id.* at 55.)

        Additionally, Jaworowicz testified that Petitioner and Williams entered his apartment

uninvited.  (*Id.* at 85.)  When he first saw them, Petitioner was holding a beer bottle upside down, and lifted

the bottle in an effort to hit Jaworowicz with it. (*Id.* at 84.) Jaworowicz grabbed Petitioner's arm to keep

from getting hit, and then Petitioner and Williams began to beat Jaworowicz.  (*Id.*; *Id.* at 86-87.)

Jaworowicz ended up on the ground underneath the dining room table.  (*Id.* at 84.)  At the time of the

incident he was unsure if he lost consciousness, but Jaworowicz testified at trial that he must have done so.

(*Id.* at 89.)  While Jaworowicz was on the ground, Petitioner hit him with a wooden chair, which broke,

and then Petitioner hit him with the broken chair.  (*Id.* at 84, 89.)  Ultimately, Petitioner obtained

Jaworowicz's knife and stabbed Jaworowicz in the stomach with it.  (*Id.* at 84, 90.)

        Dr. Anderson testified that Jaworowicz had a posterior contusion, bloody lips and a

puncture wound to the abdomen.  (*Id.* at 122, 124, 133.)  Moreover, contrary to Petitioner's assertion,

Dr. Anderson never testified that Jaworowicz's wound was not life threatening.  But, even if he had, actual

injury was not an element that the state was required to prove in order to obtain a conviction.  *See* M Crim

JI 17.7; Mich. Comp. Laws § 750.84.

        In light of the evidence that Jaworowicz was beaten and stabbed, the jury reasonably

concluded that Petitioner assaulted Jaworowicz with the intent to do great bodily harm less than murder.[3]

---

[3]Notably, during its deliberations, the jury sought clarification regarding whether the word "knife" could be replaced with the word "dangerous weapon" in connection with the instruction that asked the jury to determine whether Petitioner "or someone he aided or abetted committed the assault with a knife." (Tr. III, 64.) While it is not clear that the jury's question relates to the assault with intent to commit great bodily harm less than murder charge or the first-degree home invasion charge, the question does suggest that the jury was not entirely focused on Petitioner's use of the knife,

Consequently, the decision of the Michigan Court of Appeals was not an unreasonable application of *Jackson*.

### 2.  Ground Two—Insufficient Evidence: First-degree Home Invasion

Petitioner argues that the prosecutor failed to introduce sufficient evidence to support a guilty verdict with respect to the first-degree home invasion charge. Specifically, Petitioner argues that the prosecutor failed to marshal sufficient evidence to establish that Petitioner entered the apartment where Jaworowicz lived without permission. Petitioner contends that the evidence demonstrated that Petitioner came and went from the apartment in which Jaworowicz lived and that Fuentes' testimony was ambiguous regarding whether she told Williams he should enter the apartment to talk to Jaworowicz about the allegedly stolen drugs.

As noted above, *Jackson* sets forth the standard this Court uses when examining a claim for insufficient evidence. *Jackson*, 443 U.S. at 319. Therefore, the Court must examine the evidence supporting the conviction in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Id*. To obtain a conviction for first-degree home invasion, the prosecutor must establish that: (1) Petitioner broke into and entered "a dwelling with intent to commit a felony, larceny, or assault in the dwelling;" or (2) Petitioner entered "a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling," or (3) Petitioner broke into and entered "a dwelling or enter[ed] a dwelling without permission and, at any time while he . . . is entering, present in, or exiting the dwelling, commits a felony, larceny, or assault and at any time while [Petitioner]

---

to the exclusion of any other potential weapons, *to wit*, the chair or a piece of the broken chair. Thus, while the knife was likely among the weapons the jury considered in finding Petitioner guilty, it may not have been the only weapon the jury believed Petitioner had used with the intent to do great bodily harm.

is entering, present in, or exiting the dwelling either of the following circumstances exists: (a) [Petitioner] is armed with a dangerous weapon or (b) another person is lawfully present in the dwelling." MICH. COMP. LAWS § 750.110a(2).

> The Michigan Court of Appeals considered and rejected Petitioner's argument as follows:

> The elements of first-degree home invasion are: (1) the defendant broke and entered a dwelling or entered the dwelling without permission; (2) when the defendant did so, he intended to commit a felony, larceny, or assault, or he actually committed a felony, larceny, or assault while entering, being present in, or exiting the dwelling; and (3) another person was lawfully present in the dwelling or the defendant was armed with a dangerous weapon. *People v Sands*, 261 Mich App 158, 162; 680 NW2d 500 (2004); MCL 750.110a(2).

> On appeal, defendant solely asserts that the prosecutor failed to present sufficient evidence to prove the element of entry without permission. "Without permission" means "without having obtained permission to enter from the owner or lessee of the dwelling or from any other person lawfully in possession or control of the dwelling." MCL 750.110a(1)(c). Defendant argues that the evidence at trial showed that codefendant Williams generally had permission to enter the victim's apartment, and that, on the night of the incident, the victim's girlfriend implicitly allowed defendant and Williams to enter her apartment when she instructed codefendant Williams to discuss his accusations against the victim directly. However, at trial, the victim's girlfriend denied that she granted Williams or defendant permission to enter her apartment during a telephone conversation and denied that they had permission to enter her apartment "unannounced." A victim's testimony alone may be sufficient evidence to support the elements of a crime. *People v Taylor*, 185 Mich App 1, 8; 460 NW2d 582 (1990). It is the jury's duty to determine the credibility of the witnesses, and this Court will not interfere with that determination. *People v Williams*, 268 Mich App 416, 419; 707 NW2d 624 (2005). This Court resolves all conflicts regarding the credibility of witnesses in support of the jury's verdict, *Nowack, supra* at 400, and not in the light most favorable to defendant. We reject defendant's sufficiency of the evidence argument.

(MCOA Op., 2, docket #38 (footnote omitted)).

> Examining the evidence supporting the conviction in the light most favorable to the prosecution, there was sufficient evidence to establish that Petitioner entered the apartment without

permission. Lori Fuentes' testimony was unambiguous. She testified that Petitioner and Williams did not have permission to enter her apartment unannounced and uninvited, and specifically, that neither Williams nor Petitioner had permission to enter her apartment on the night of the incident. (*Id.* at 58-59.) Moreover, Fuentes testified that when Williams called her she did not tell Williams or Petitioner to go into her apartment to talk with Jaworowicz. (*Id.* at 55.)

Jaworowicz testified that he did not hear a knock or anyone ask if they could come into the apartment prior to seeing Williams and Petitioner inside the apartment. (*Id.* at 86.) Additionally, Jaworowicz testified that he did not open the door for Petitioner and Williams, he was not expecting them to come over and that he did not invite them into the apartment. (*Id.* at 85.)

Based upon this testimony, the jury reasonably could conclude that Petitioner entered the apartment without permission. Consequently, the decision of the Michigan Court of Appeals was not an unreasonable application of *Jackson*.

3.  Ground Three—Due Process Violation: Amended Information

Petitioner argues that the trial court violated his due process right when it allowed the prosecutor to amend the information to change the charge against Petitioner from third-degree home invasion to first-degree home invasion.

The state court considered and rejected this claim as follows:

Defendant argues his right to due process was violated when the prosecutor amended the information to add a count of Home Invasion - 1st Degree because it violated his right to a preliminary examination. This Court disagrees. An information may be amended at any time before, during or after trial in respect to, *inter alia*, a substantive omission or to conform to the evidence, as long as the defendant is not unfairly prejudiced or surprised by the amendment, and a new offense is not added. MCL 767.76; *People v. McGee*, 258 Mich App 683; 672 NW2d 191 (2003). Permitting the amendment did

- 21 -

not violate a defendant's right to be informed of the nature of the accusation. The amendment occurred early in the proceedings and was not prejudicial to Defendant's rights. *See People v. Kiser*, 122 Mich App 321; 332 NW2d 477 (1983). Moreover, a new offense was not added.

Defendant was originally charged with Home Invasion - 3rd Degree the elements of which, under the prosecution's theory were (1) entering a dwelling; (2) without permission; and (3) at any time while he is entering, present in, or exiting the dwelling, commits a misdemeanor or intends to commit a misdemeanor. Assault and battery is a misdemeanor.

The amended information charges Defendant with Home Invasion - 1st Degree, the elements of which were, under the prosecution's theory, (1) entering a dwelling, (2) without permission; and (3) at any time while he is present in the dwelling commits a felony, larceny **or assault**.

Thus, because the additional offense committed within the dwelling was an assault, the same elements were required to be proven for both Home Invasion - 1st Degree and Home Invasion - 3rd Degree. Consequently, because a new offense was not added, the same defenses and evidence were required for both charges, the amendment occurred early in the proceedings, the amendment was valid.

(Circuit Court Ord., 2-3, docket #40) (emphasis in original).

The sufficiency of a state charging information is generally not a proper subject for habeas corpus review. *Knewel v. Egan*, 268 U.S. 442, 446 (1925). "The due process clause of the Fourteenth Amendment mandates [only] that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him to permit adequate preparation of his defense." *Olsen v. McFaul*, 843 F.2d 918, 930 (6th Cir. 1988) (quoting *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984)). A complaint or indictment "which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986). Thus, when reviewing amendments to state charging documents in habeas corpus proceedings, the federal courts focus on the questions whether the defendant

was surprised by the amendment or otherwise prejudiced in his ability to defend himself at trial. *See Rhea v. Jones*, 622 F. Supp. 2d 562, 583 (W.D. Mich. 2008); *see also Tague v. Richards*, 3 F.3d 1133, 1141–42 (7th Cir. 1993) (finding that amendment to information on the date of trial to include the words "and/or sexual intercourse" to information charging petitioner with engaging in sexual[lly] devia[nt] conduct with a minor was not a due process violation because petitioner was aware "right from the start" that the victim alleged that he had tried to have sexual intercourse with her and because petitioner failed to demonstrate "how his defense would have differed had the information been amended earlier."); *Johnson v. Mackie*, No. 11-cv-13364, 2014 WL 1418678, at *7 (E.D. Mich. Apr. 14, 2014) (finding that "amendment from open murder (which encompasses first-degree and second-degree murder) to first-degree murder two months before trial did not alter the crime charged nor unfairly surprise Petitioner").

   In the instant case, Petitioner was not surprised by the amendment to the information. Nearly two-months before the start of his trial, Petitioner was aware that his third-degree home invasion charge would be changed to a first-degree home invasion charge if he decided to go to trial.  Sometime prior to March 22, 2006, Petitioner's counsel submitted a "Notice of Intent to Plea" requesting that Petitioner's case be placed on the trial court's March 22, 2006 "Plea Calendar" so that Petitioner could plead to Counts 1 and 2, the prosecutor would dismiss Count 3 and the supplementals and would "not write home invasion 1st [degree]." (*See* Notice of Intent to Plea, docket #39.) Thus, several months before trial, Petitioner was well aware that the prosecutor intended to change the charge to first-degree home invasion if he did not accept the plea agreement.   Apparently, Petitioner's case could not be set for the March 22, 2006 plea calendar, and instead the plea hearing took place on April 12, 2006. (*See* 4/12/06 Hearing Transcript, docket #33.)  Although Petitioner ultimately opted not to take the plea offer,

at the hearing the prosecutor made clear that should Petitioner decide to go to trial, he would be tried on a charge of first-degree home invasion. (*Id.*) Shortly thereafter, on April 25, 2006, Petitioner received a letter from his attorney explaining to him that the prosecutor had amended the information to add a first-degree home invasion charge, as the prosecutor said he would do at the plea hearing. (*See* 4/25/06 Letter, docket #39.) Thus, by April 12, 2006, at the latest, Petitioner was aware that he would be tried on a charge of first-degree home invasion rather than third-degree home invasion. If by any chance Petitioner did not believe in the sincerity of the prosecutor's intentions, by April 25, 2006, he had an explanatory letter from his counsel. Trial did not commence until May 30, 2006. Accordingly, at the very minimum Petitioner was aware of the charges upon which he would be tried for more than a month. Under the circumstances, Petitioner could hardly have been surprised by the amendment to the information.

Moreover, Petitioner cannot show that he was prejudiced by the amendment. When Petitioner received the original charging information he was on notice that he was being charged with third-degree home invasion under MICH. COMP. LAWS § 750.110a, which sets forth the necessary elements to establish a violation of first-degree through third-degree home invasion. The core elements are the same for each degree: (1) breaking and entering or entering a dwelling without permission; and (2) intending to commit or committing another offense. In Petitioner's case, he was charged with breaking and entering, or entering without permission, "a dwelling located at 320 Henry Ave SE, and while entering, present in, or exiting the dwelling" committing an assault and battery. (*See* January 19, 2006 Felony Information, docket #39.) When the charge was amended to first-degree home invasion, the elements necessary to

prove the violation did not materially change. Indeed, the only change was that rather than establishing that a misdemeanor assault occurred, the prosecutor had to prove a felony assault.[4]

Finally, Petitioner does not suggest anything that he would have done differently had he been aware of the amendment to the information earlier in the process. *See Edwards v. Bell,* No. 2:09-CV-14135, 2012 WL 481234, at **14-15 (E.D. Mich. Feb. 14, 2012) (denying habeas relief where petitioner failed to show that he was prejudiced in his ability to defend himself at trial where information was amended on day of trial to remove reference to a knife and add a reference to "other dangerous weapon"). At trial, Petitioner's defense was that he had permission to enter the Fuentes/Jaworowicz apartment at will. Undoubtedly, Petitioner's defense would have been the same regardless of whether he had been charged with first-degree or third-degree home invasion, and Petitioner does not suggest otherwise.

Petitioner has failed to show that he lacked adequate notice of the charges against him in this case and therefore, he is not entitled to habeas relief.

### 4.  Ground Five—Jury Question

Petitioner argues that the trial court violated his constitutional rights when it responded to a jury question when Petitioner was not present and had not waived his right to be present.

As noted above, during its deliberations, the jury sent a written question to the judge asking whether the phrase "dangerous weapon" could be used to replace the word "knife" in connection with the

---

[4]A third-degree home invasion charge requires proof of a misdemeanor assault while a first-degree home invasion charge requires proof of felony assault.  The use of a dangerous weapon is the sole distinguishing feature between the two crimes.  *See People v. Smith*, 371 N.W.2d 496, 501-02 (Mich. Ct. App. 1985) (citation omitted) (explaining that "[t]he misdemeanor simple assault is distinguished from the felony assault with intent to do great bodily harm less than murder by the actor's intended result. Felonious assault is distinguished from simple assault by the use of a dangerous weapon in the perpetration of the assault.").

jury instruction that asked whether "defendant or someone he aided or abetted committed the assault with

a knife." (Tr. III, 63-64.)  The trial judge discussed the note with counsel in chambers and it was agreed

that the judge would issue a written response which stated:  "Yes, it can, and my initial instruction should

have said, ' . . . with a knife or other dangerous weapon.'  I apologize for that oversight in my initial

instructions." (*Id.* at 63.)  The judge signed and initialed the response and returned it to the jury at 12:46

p.m. (*Id.*) On the record, prior to receiving the jury's verdict, Petitioner's counsel stated that she believed

the Judge's response to the jury reflected the correct statement of the law.  (*Id.* at 64.)

The state court considered and rejected Petitioner's claims stating:

> Defendant argues that his Constitutional rights were violated when the court answered a jury question regarding the instructions outside of Defendant's presence. However, the trial transcript clearly reflects that the attorneys met with this Court in chambers and consented to issuing a written response to the jury. Defendant asserts that he was not informed by counsel that there was a question, and that counsel did not have authority to waive Defendant's right to be present.

> Even assuming that counsel's waiver of Defendant's presence was ineffective, see *People v. Montgomery*, 64 Mich App 101, 103; 235 NW2d 75 (1975), Defendant would not be entitled to the relief he seeks.  In order for Defendant to be entitled to relief, he must demonstrate a "reasonable probability of prejudice" resulting from his absence. *People v. Morgan*, 400 Mich. 527, 536; 255 NW2d 603 (1977). In the instant case, the Court merely answered a simple question regarding clarification of a jury instruction. Defendant does not assert that the answer this Court provided to the jury was in any way flawed.  Rather, Defendant merely uses the question itself to bolster his belief that his attorney should have moved for suppression of the knife.  However, as stated above, there were no grounds for suppression.  Moreover, Defendant fails to explain how he was prejudiced by not being present for this Court's answer to the question.

(Circuit Court Ord., 4-5, docket #40.)

A defendant has a constitutional right to "be present at any stage of the criminal proceeding

that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky*

*v. Stincer*, 482 U.S. 730, 745 (1987). This right, however, "is not absolute, but exists only when his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *United States v. Henderson*, 626 F.3d 326, 343 (6th Cir. 2010) (quotation marks omitted). "In other words, the defendant's presence is not guaranteed when it would be useless, but only to the extent that a fair and just hearing would be thwarted by his absence." *Id*. (quotation marks omitted). Indeed, the U.S. Constitution "does not require the defendant to be present when his 'presence would be useless, or the benefit but a shadow.'" *Cathron v. Jones*, 190 F. Supp. 2d 990, 1001 (E.D. Mich. 2002) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 106–107 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964)). A defendant's presence at a hearing is "largely a matter of form when a defendant's lawyer is present at proceedings that raise largely legal issues." *Id*. at 1001–1002 (quoting *Fisher v. Roe*, 263 F.3d 906, 916 (9th Cir. 2001)).

The state court did not unreasonably determine that Petitioner failed to establish any prejudice as a result of his absence from the events surrounding the jury question and the trial court's response to that question. The jury asked a straightforward legal question, which the trial court responded to in writing, after consultation with counsel. Petitioner does not explain how the situation would have transpired differently had he been present. Moreover, the United States Supreme Court has not determined whether the answering of jury questions constitutes a critical stage of the proceedings at which a criminal defendant is constitutionally entitled to be present. Therefore, Petitioner cannot establish that habeas corpus relief is warranted on this claim. *See Martin v. Moore*, No. 2:12-cv-878, 2013 WL 6578936, at *12 (S.D. Ohio Dec. 16, 2013) (citing *Lopez v. Hernandez*, 2010 WL 2764699, at *7 (N.D. Cal. July 13, 2010); *La Crosse v. Kernan*, 244 F.3d 702, 707–08 (9th Cir. 2001)).

5.      Grounds Four and Six—Ineffective Assistance of Trial and Appellate Counsel

Petitioner alleges two claims for ineffective assistance of counsel; claim four regarding trial counsel's performance and claim six regarding appellate counsel's performance. Ineffective assistance of both trial and appellate counsel are governed by the same standard.      In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is

- 28 -

"doubly" deferential. *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Richter*, 131 S. Ct. at 786).

> a.   Ground Four—Failure of Trial Counsel to Challenge
>      Admission of the Knife.

Petitioner argues that his trial counsel was ineffective for failing to challenge the admission of the knife where the alleged knife was not recovered until several weeks after the incident and there was no DNA evidence on the knife to link it to either Jaworowicz or Petitioner.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000)

(quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner has not met this difficult standard.

Petitioner cannot show that the admission of the knife offended some fundamental principle of justice. *See Seymour*, 224 F.3d at 552. Petitioner does not dispute that Jaworowicz had been stabbed, or that Jaworowicz had been stabbed with his own knife. Petitioner also does not dispute that the knife offered in evidence was the knife that belonged to Jaworowicz and that Petitioner had used it to stab Jaworowicz. Just because the knife was not recovered until several weeks after the incident and because it did not contain any DNA evidence, does not mean that it should have been excluded. The trial court did not err in admitting the knife. Moreover, even if admitting the knife was error, Petitioner has not established that the error resulted in a fundamentally unfair trial. *See Cooper v. Sowders*, 837 F.2d 284, 287 (6th Cir. 1988) (concluding that federal habeas corpus relief is only available where a violation of a state's evidentiary rule results in the denial of fundamental fairness, and therefore, a violation of due process). Consequently, counsel was not deficient in failing to move to suppress the knife. The Sixth Circuit has long held that counsel's failure to make a frivolous or meritless motion does not constitute ineffective assistance

- 30 -

of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004).

Therefore, Petitioner is not entitled to relief on his claim of ineffective assistance of trial counsel.

b.    Ground Six—Failure to Raise the Claims on Direct Appeal.

Defendant argues that counsel was ineffective for failing to raise the above issues on appeal. Because each of the grounds for relief raised by Petitioner in his habeas petition are without merit, appellate counsel cannot have been ineffective for failing to raise them on appeal. *See Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001) ( finding that "'appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit'"). Therefore, Petitioner is not entitled to relief on his claim of ineffective assistance of appellate counsel.

**Conclusion**

In light of the foregoing, the Court will dismiss Petitioner's application because it fails to raise a meritorious federal claim.

**Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the

- 31 -

standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

        The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

        A Judgment and Order consistent with this Opinion will be entered.


Dated: <u>February 27, 2015</u>       <u>/s/ Paul L. Maloney</u>
                                Paul L. Maloney
                                Chief United States District Judge